DAVID J. VAN HAVERMAAT (Cal. Bar No. 175761)
Email: vanhavermaatd@sec.gov
DAVID M. ROSEN (Cal. Bar No. 150880)
Email: rosend@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>            Plaintiff,<br><br>   vs.<br><br>ROBERT CORTEZ MARSHALL,<br><br>            Defendant. | Case No. 2:17-cv-2189<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa.

2. Defendant has, directly or indirectly, made use of the means or

instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district and because defendant Robert Cortez Marshall resides in this district.

## SUMMARY

4. This matter involves an unregistered and fraudulent securities offering by defendant Robert Cortez Marshall ("Defendant" or "Marshall"), who operated a now-defunct Nevada corporation called R.B.J. Generational Wealth Management, LLC, dba Adz on Wheelz ("Adz").

5. Between approximately January 2014 and January 2015, Marshall raised at least $5.7 million from approximately 200 investors residing in several states in an unregistered offering of Adz's securities.

6. Marshall drafted, reviewed, and revised Adz's offering materials. The offering materials promised investors "guaranteed weekly royalty" payments that corresponded to returns on investments of over 200% a year.

7. Through Adz's offering materials, Marshall represented to investors that Adz would use investor funds to purchase cars that would display advertisements on large computer monitors installed into the cars' doors, roof, and trunk, and to pay related operating costs. Marshall represented that the cars would become mobile billboards driven through the streets of Las Vegas to promote advertisers' products.

8. Adz, however, sold few advertisements and, consequently, generated only $5,000 in advertisement revenue. Its advertisement displays were beset by technical issues related to the poor visibility of the monitors. Despite the minimal revenue, Marshall made approximately $2.54 million in royalty payments to

investors. Marshall made the royalty payments to existing investors with new investors' money, thereby operating a Ponzi scheme.

9. In addition to operating Adz as a Ponzi scheme, Marshall misappropriated $1.63 million of investor funds for his personal benefit, including cash withdrawals, checks made payable to himself, and for personal expenses.

10. Through Adz's offering materials, Marshall also made false and misleading statements to investors, including representations that investors could receive a full refund, which was not possible, and baseless projections regarding the ad revenue that each car would generate.

11. By operating Adz as a Ponzi scheme, misappropriating investor funds, and making material misrepresentations and omissions to investors, Marshall violated the antifraud provisions of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 17(a) of the Securities Act. Marshall also violated the securities registration provisions of Sections 5(a) and 5(c) of the Securities Act.

12. With this action, the SEC seeks against Marshall a permanent injunction, disgorgement of ill-gotten gains with prejudgment interest, and civil penalties.

## THE DEFENDANT

13. **Robert Cortez Marshall** ("Defendant" or "Marshall") resides in Las Vegas, Nevada. Marshall was Adz's CEO and controlled Adz as the sole trustee, settlor, and beneficiary of R.B.J. Generational Wealth Management Trust, Adz's sole owner.

## THE ALLEGATIONS

A. The Unregistered Fraudulent Offering

14. In early 2014, Marshall developed Adz's business model of raising money from investors to fund a mobile digital advertising company. Marshall's purported business model for Adz involved mounting flat screen monitors on the exterior of the doors, roof, and trunk of (preferably exotic) cars. The monitors would display paid digital advertisements, and the cars would be driven through the streets

of Las Vegas as mobile billboards.

15. Beginning in early 2014, Marshall initially sold investments, which he referred to as "fractional interests," to several investors, whom he called "Brand Promoters."

16. Marshall recruited the Brand Promoters to sell investments to their friends and family and to other potential investors. Marshall hired the Brand Promoters, referred potential investors to the Brand Promoters, and provided the Brand Promoters with the Adz offering materials that they provided to potential investors. The Brand Promoters, who were also investors and recruited by Marshall, solicited most of the other investors in Adz.

17. In addition to the use of Brand Promoters, Marshall advertised the sale of the fractional interests on Adz's website, which Marshall created and updated. Marshall also posted videos offering Adz's securities for sale on YouTube.com.

18. Through Adz's offering materials, Marshall represented that investors were to receive a small ownership interest in a car that would provide the investor a "guaranteed weekly royalty" payment of between $5 and $31 per week, depending upon the amount of their investment.

19. The weekly royalty that Marshall promised to investors corresponded to an annual return on investment of over 200%.

20. The following table summarizes the options available to investors as described in an offering document (called the "Managed Fractional Ownership Packet"), that was drafted, reviewed, and revised by Marshall, and that was provided to potential Adz investors, both directly by Marshall and by the Brand Promoters:

| Car Level | Entry Level | Premium Level | Luxury Level | Exotic Level |
|---|---|---|---|---|
| Sample Car Brand | Volkswagen, Honda | Mustang, Jeep | Mercedes | Lamborghini, Maserati |
| Investment Amount (per share) | $125 | $360 | $480 | $625 |
| Royalty Payment per week/year | $5/$260 | $15/$780 | $20/$1,040 | $31/$1,612 |
| Annual Return on Investment | 208% | 216% | 216% | 258% |

21. Although the offering materials provided that investors were entitled to drive the car they partially owned for up to one hour a month, Adz anticipated hiring drivers, and not investors, to drive the cars to generate revenue.

22. The offering materials represented that investors were to receive the promised royalty payments for the life of the car. When the car was no longer operational, the investment was to be transferred to another car, and the investor would receive the same royalty payment and ownership interest in the new car. Consequently, as designed, the royalty payments to investors were to continue in perpetuity.

23. Because the minimum investment amount ($125 to $625 per share) was relatively small, Adz attracted investors who did not meet the definition of "accredited investors" as defined in Rule 501 of Regulation D under the Securities Act, 17 C.F.R. § 230.501.

24. Marshall and the Brand Promoters took no steps to verify the financial condition of Adz's investors (e.g., their net worth or annual income), or otherwise verify that investors were accredited, before they invested.

25. Marshall facilitated investments by unaccredited and unsophisticated investors by providing them with internet links to online lenders, such as LendingClub.com, if they could not otherwise afford to invest in Adz.

26. One Brand Promoter borrowed approximately $66,000 from three online

lenders at Marshall's urging and was encouraged by Marshall to reinvest her royalty payments rather than paying off her loan balances. She did so, but when Adz later failed to make her royalty payments as promised, she was unable to pay her loan payments, which led to her filing for personal bankruptcy.

27. Between January 2014 and January 2015, Adz raised at least $5.7 million from 209 investors located throughout the United States.

**B.   Marshall Engaged In A Fraudulent Scheme**

28. Marshall engaged in a fraudulent scheme to convince investors to invest in Adz so that he could profit financially.

29. In Adz's offering materials, which Marshall drafted, reviewed, and revised, Marshall encouraged investors by offering investments with a small minimum investment amount that promised purported weekly royalty payments that equaled annual returns of over 200%.

30. While encouraging investors to invest, both directly and through the Brand Promoters whom he recruited, Marshall operated Adz as a Ponzi scheme, paying existing investors with new investors' money. Marshall also misappropriated substantial amounts of investor funds for his personal benefit.

31. At all relevant times, Marshall perpetrated his fraudulent scheme knowingly or recklessly, or through a failure to exercise reasonable care.

**1.   Marshall operated Adz as a Ponzi scheme**

32. Marshall opened or directed others to open Adz's bank accounts and was a signatory for each account.

33. Adz sold virtually no advertisements because the cars' monitors were unreadable in the daytime due to the glare from the sun and had poor screen resolution.

34. Adz was never able to resolve these technical issues and therefore generated only $5,000 in advertising revenue.

35. Even though Adz generated only $5,000 in revenue, Marshall and Adz

issued approximately $2.54 million in purported royalty payments to investors. Because Adz did not generate sufficient revenue to make the royalty payments, Marshall used funds raised from new investors to pay royalty payments to existing investors.

36. In at least fifteen instances, investors received cumulative royalty payments that exceeded their total investments.

37. Marshall's distributions of purported royalty payments to investors deceived investors into believing that Adz was generating advertising revenue sufficient to make the payments, when Marshall was actually operating Adz as a Ponzi scheme.

38. Marshall knew or was reckless in not knowing that he was committing, or he failed to exercise reasonable care regarding committing a manipulative or deceptive act in furtherance of a scheme to defraud by using funds raised from new investors to pay royalty payments to existing investors.

**2.     Marshall misappropriated investor funds**

39. Marshall used only a small percentage of the money raised from investors to be spent on Adz's business. Specifically, Adz spent only $1.42 million of the $5.7 million raised from investors, or 24%, on its operations.

40. Adz purchased approximately twenty cars, but converted only two of them to display ads. After the offering ended, Adz's lenders subsequently repossessed all of the cars after Adz stopped making the loan payments on them.

41. Marshall misappropriated $1.63 million of investor funds for his personal benefit, including large cash withdrawals, checks made payable to himself, and for personal expenses, including merchandise, meals and entertainment.

42. Marshall's receipt of funds from investors and his distributions of purported royalty payments to investors deceived investors into believing that Marshall and Adz would use the funds for legitimate business purposes, when in fact Marshall misappropriated $1.63 million of investor funds for his personal use and

expenses.

43. Marshall knew or was reckless in not knowing that he was committing, or he failed to exercise reasonable care regarding committing a manipulative or deceptive act in furtherance of a scheme to defraud by misappropriating substantial amounts of investor funds for his personal benefit.

**C.  Marshall Made Misrepresentations And Omissions Of Material Facts**

44. In connection with the offering of Adz's securities, Marshall made material misrepresentations to investors. These misrepresentations related to the promise of a full refund of the investments, and baseless projections regarding the revenue that Adz's cars would generate.

**1.  Misrepresentations and omissions regarding the availability of refunds to investors**

45. Adz's offering materials, which Marshall drafted, promised investors a full refund of their investment. One document, entitled "Fractional Ownership Cancellation," which was available on Adz's website, represented that "[e]xisting fractional owners may request to cancel their fractional ownership agreement for any reason during [sic] first (12) twelve months of their contract and receive a refund of all amounts they have paid under their fractional ownership agreement." The document further stated that the refunds would be paid in quarterly installments and that the full refund amount would be paid within 12 months of each request.

46. Adz could not have refunded all of the investors' investments. It had insufficient funds available to do so because of the failure of Adz to generate any meaningful advertising revenue, and because its funds were depleted by the royalty payments it routinely made to investors and Marshall's misappropriation of investor funds.

47. Marshall knew, or was reckless in not knowing, that Adz would not be able to provide full refunds to investors. Marshall also failed to exercise reasonable care by making materially misleading representations and omissions regarding the

ability of Adz to pay full refunds to investors.

48. Investors would have considered it material to their investment decision to know that they would be unable to receive a full refund of their investment.

### 2. Misrepresentations and omissions regarding financial projections

49. Adz's offering materials contained baseless financial projections. Specifically, the offering materials included the following summary of the projected revenues that each car would generate:

| Car Level | Entry Level | Premium Level | Luxury Level | Exotic Level |
|---|---|---|---|---|
| Monthly Ad Revenue Per Car | $247,500 | $312,500 | $437,500 | $625,000 |
| Yearly Ad Revenue Per Car | $2,970,000 | $3,750,000 | $5,250,000 | $7,500,000 |

50. The financial projections contained in Adz's offering materials were purportedly based upon Marshall's supposed belief that Adz could sell 60-second ads for $0.99 each.

51. There was no reasonable basis for Marshall's purported belief that Adz could sell 60-second advertisements for $0.99 each.

52. Marshall was aware of undisclosed facts tending to undermine the accuracy of the financial projections contained in Adz's offering materials.

53. For example, Marshall knew or was reckless in not knowing, but did not disclose, that Adz had only generated $5,000 in revenue from the sale of advertisements and did not have contracts to generate the advertising revenue that it projected in its offering materials.

54. Marshall also knew or was reckless in not knowing, but did not disclose, the technical issues related to the poor visibility of the monitors on Adz's cars.

55. Investors would have considered it material to their investment decision to know that there was no reasonable basis for the financial projections contained in

Adz's offering materials.

56. Investors also would have considered it material to their investment decision to know of the undisclosed facts tending to undermine the accuracy of the financial projections, specifically the facts that Adz had only generated $5,000 in revenue from the sale of advertisements and did not have contracts to generate the advertising revenue that it projected in its offering materials and the technical issues related to the poor visibility of the monitors.

57. Marshall knew, or was reckless in not knowing, that these misrepresentations were false and misleading when made. Marshall also failed to exercise reasonable care by making materially misleading representations and omissions regarding the projected revenues that each car would generate that were contained in Adz's offering materials.

### D. Marshall Obtained Money By Means Of His Fraud

58. Marshall received money by means of the materially untrue statements and omissions alleged above in the offer and sale of Adz's securities.

59. Marshall obtained money in the form of large cash withdrawals, checks made payable to himself, and payments for personal expenses, all paid for by investor funds, totaling $1.63 million.

60. Marshall also obtained money in the form of salary and bonuses of approximately $180,000, that he caused Adz to pay to him, which was paid from funds raised from investors in Adz.

### E. Marshall's Securities Offering Registration Violations

61. The fractional interests in Adz are securities under the federal securities laws. Investor monies were pooled for the purpose of funding Adz's operations. Investors' returns depended solely upon Adz's efforts. Adz's offering documents promised weekly royalties that equaled annual returns of more than 200%, and were offered to investors in numerous states. Prospective investors were solicited both by Marshall directly, and by the "Brand Promoters" whom Marshall recruited.

62. Marshall and the Brand Promoters offered and sold Adz's securities through interstate commerce to investors in multiple states, including through Adz's website, YouTube.com, the mail, and telephones.

63. Marshall was a necessary participant in, and played a substantial role in, the offer and sale of Adz's securities. Marshall drafted, reviewed, and revised Adz's offering materials that were sent to prospective investors, and he recruited the Brand Promoters to offer and sell Adz's securities.

64. No registration statement has been filed with the SEC for the offer or sale of any of the Adz securities sold by Marshall or others.

## FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and**

**Rules 10b-5(a) and (c) Thereunder**

65. The SEC realleges and incorporates by reference paragraphs 1 through 64 above.

66. As alleged above in paragraphs 4 through 43, among other allegations, defendant Marshall participated in activities with the principal purpose and effect of creating a false appearance regarding the ability of Adz to generate sufficient revenue to make the royalty payments and the use of investor funds for legitimate business purposes.

67. By engaging in the conduct described above, defendant Marshall, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

68. By engaging in the conduct described above, defendant Marshall violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act, 15

U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a) and (c).

## SECOND CLAIM FOR RELIEF

### Fraud in the Connection with the Purchase and Sale of Securities

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder

69. The SEC realleges and incorporates by reference paragraphs 1 through 64 above.

70. As alleged above in paragraphs 4 through 27 and 44 through 57, among other allegations, defendants Marshall made material misrepresentations and omissions to investors regarding the promise of a full refund of their investment at any time upon request, and baseless projections regarding the revenue that Adz's cars would generate.

71. By engaging in the conduct described above, defendant Marshall directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter, made untrue statements of a material fact or omitted to state a fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

72. By engaging in the conduct described above, defendant Marshall violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## THIRD CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a)(1) and 17(a)(3) of the Securities Act

73. The SEC realleges and incorporates by reference paragraphs 1 through 64 above.

74. As alleged above in paragraphs 4 through 43, among other allegations, defendant Marshall participated in a scheme to defraud purchasers of Adz's securities,

which included paying distributions to existing investors with money from new investors to convince investors to continue to invest in Adz so that Marshall could misappropriate investor funds.

75. By engaging in the conduct described above, defendant Marshall, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) with scienter, employed devices, schemes, or artifices to defraud; and (b) with scienter or negligently, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

76. By engaging in the conduct described above, defendant Marshall violated, and unless enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) and 77q(a)(3).

## FOURTH CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a)(2) of the Securities Act

77. The SEC realleges and incorporates by reference paragraphs 1 through 64 above.

78. As alleged above in paragraphs 4 through 27 and 44 through 60, among other allegations, defendant Marshall obtained money by means of materially untrue statements and omissions to investors regarding the promise of a full refund of their investment at any time upon request, and baseless projections regarding the revenue that Adz's cars would generate.

79. By engaging in the conduct described above, defendant Marshall, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly, with scienter or negligently, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were

made, not misleading.

80. By engaging in the conduct described above, defendant Marshall violated, and unless enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

### FIFTH CLAIM FOR RELIEF

**Unregistered Offer and Sale of Securities**

**Violations of Sections 5(a) and 5(c) of the Securities Act**

81. The SEC realleges and incorporates by reference paragraphs 1 through 64 above.

82. As alleged above in paragraphs 14 through 27 and 61 through 64, among other allegations, defendant Marshall directly or indirectly offered and sold securities of Adz in an offering or offerings that were not registered with the SEC.

83. By engaging in the conduct described above, defendant Marshall, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

84. By engaging in the conduct described above, defendant Marshall violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

### PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

**I.**

Issue findings of fact and conclusions of law that defendant Marshall committed the alleged violations.

**II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining defendant Marshall, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**III.**

Order defendant Marshall to disgorge all funds received from his illegal conduct, together with prejudgment interest thereon.

**IV.**

Order defendant Marshall to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: August 15, 2017

/s/ David J. Van Havermaat
David J. Van Havermaat
David M. Rosen
Attorneys for Plaintiff
Securities and Exchange Commission