1

2

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

3

4

5

6

7

8

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>         Plaintiff<br><br>v.<br><br>ROBERT CORTEZ MARSHALL,<br><br>         Defendant | Case No.: 2:17-cv-02189-JAD-EJY<br><br>**Order Granting Plaintiff's Motion for Final Judgment Setting Amounts of Disgorgement, Prejudgment Interest, and Penalty; Order Overruling Objection to Magistrate Judge's Order; Final Judgment**<br><br>[ECF Nos. 28, 43] |

9

10

11

12

13

14

15

16

17

The Securities and Exchange Commission ("SEC") brought this action alleging that the defendant, Robert Cortez Marshall, operated a now-defunct Nevada corporation called R.B.J. Generational Wealth Management, LLC, dba Adz on Wheelz ("Adz") as a Ponzi scheme.[1] Marshall consented to entry of judgment without admitting or denying the allegations of the complaint.[2] In doing so, he agreed to "pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty," the amounts of which the parties agreed that the court would determine upon the SEC's motion. The SEC has filed that motion,[3] and I find that Marshall must disgorge $1,473,661 in ill-gotten gains and pay prejudgment interest of $286,103 and a civil penalty of $1,473,661.

18

**Jurisdiction and Venue**

19

20

This court has jurisdiction over this action under Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), and

21

22

23

---

[1] ECF No. 1, at ¶¶ 4, 8.

[2] ECF No. 19.

[3] ECF No. 28.

Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa.

### Factual Background[4]

In early 2014, Marshall developed Adz's business model of raising money from investors to fund a mobile digital-advertising company.  Marshall's purported business model for Adz involved mounting flat-screen monitors on the exterior of the doors, roof, and trunk of cars.  The monitors would display paid digital advertisements, and the cars would be driven through the streets of Las Vegas as mobile billboards.

Beginning in early 2014, Marshall sold investments, which he referred to as "fractional interests," to several investors, whom he called "Brand Promoters."  Marshall recruited the Brand Promoters to sell investments to their friends and family and to other potential investors.  Marshall hired the Brand Promoters, referred potential investors to the Brand Promoters, and provided them with the Adz offering materials that they gave to potential investors.  The Brand Promoters, who were also investors and recruited by Marshall, solicited most of the other investors in Adz.  Marshall also advertised the sale of the fractional interests on Adz's website, which he created and updated.  Marshall also posted videos offering Adz's securities for sale on YouTube.com.

---

[4] In consenting to judgment, Marshall agreed, for the purposes of the present motion, that "the allegations of the complaint shall be accepted as and deemed true by the Court; and [that] the Court may determine the issues raised in this motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure."  ECF No. 19, at 2.  Except where noted otherwise and consistent with the parties' agreement, I have drawn the background from the complaint allegations, which I have accepted as true for purposes of this motion.

Marshall encouraged investors by offering investments with a small investment amount through Adz's offering materials, which Marshall drafted, reviewed, and revised.  He represented that investors would receive a small ownership interest in a car that would provide the investor a "guaranteed weekly royalty" payment of between $5 and $31 per week, depending upon the amount of their investment.  The weekly royalty that Marshall promised to investors corresponded to an annual return on investment of over 200%.

The offering materials represented that investors would receive the promised royalty payments for the life of the car.  When the car was no longer operational, the investment would be transferred to another car, and the investor would receive the same royalty payment and ownership interest in the new car.  Consequently, as designed, the royalty payments to investors would continue in perpetuity.  Because the minimum investment amount ($125 to $625 per share) was relatively small, Adz attracted investors who did not meet the definition of "accredited investors" as defined in Rule 501 of Regulation D under the Securities Act, 17 C.F.R. § 230.501.  Marshall and the Brand Promoters took no steps to verify the financial condition of Adz's investors (e.g., their net worth or annual income) or otherwise verify that investors were accredited before they invested.  Between January 2014 and January 2015, Adz raised at least $5.7 million from 209 investors located throughout the United States.

While encouraging investors to invest, both directly and through the Brand Promoters whom he recruited, Marshall operated Adz as a Ponzi scheme, paying existing investors with new investors' money.  He opened or directed others to open Adz's bank accounts and was a signatory for each account.  Adz sold virtually no advertisements because the cars' monitors were unreadable in the daytime due to the glare from the sun and had poor screen resolution.

1  Adz was never able to resolve these technical issues and generated only $5,000 in advertising

2  revenue.

3        Even though Adz generated only $5,000 in revenue, Marshall and Adz issued

4  approximately $2.54 million in purported royalty payments to investors.  Because Adz did not

5  generate sufficient revenue to make the royalty payments, Marshall used funds raised from new

6  investors to pay royalty payments to existing investors.  His distributions of purported royalty

7  payments to investors deceived investors into believing that Adz was generating advertising

8  revenue sufficient to make the payments when Marshall was actually operating Adz as a Ponzi

9  scheme.  Marshall knew or was reckless in not knowing that he was committing, or he failed to

10  exercise reasonable care regarding committing, a manipulative or deceptive act in furtherance of

11  a scheme to defraud by using funds raised from new investors to pay royalty payments to

12  existing investors.

13        Marshall also misappropriated substantial amounts of investor funds for his personal

14  benefit.  Marshall used only a small percentage of the money raised from investors to be spent on

15  Adz's business.  Adz spent about $1.42 million of the $5.7 million raised from investors, or 24%,

16  on its operations.  Adz purchased approximately twenty cars but converted only two of them to

17  display ads.  Adz's lenders repossessed all of the cars once Adz stopped making the loan

18  payments on them.

19        Marshall misappropriated investor funds for his personal benefit, including large cash

20  withdrawals and checks made payable to himself, and for personal expenses, including

21  merchandise, meals, and entertainment.  While the complaint alleges that Marshall

22  misappropriated approximately $1.63 million, the SEC seeks disgorgement of $1,473,660.82 in

23  its instant motion.  To support this figure, the SEC relies upon the declaration of Christopher M.

Conte, a certified public accountant working for the SEC.  Conte declares that he determined, based on a review of bank statements, brokerage records, and credit-card statements from Marshall and Adz, that approximately $5.7 million of investor funds were deposited into the bank and brokerage accounts.  Marshall withdrew, for personal use, $809,292.00 of those funds in ATM withdrawals, checks made payable to himself, and withdrawals at bank counters.  He transferred another $200,000 of those funds to his personal brokerage accounts and then wrote himself checks for them.  He also charged $304,771.00 in personal expenses on Adz's American Express credit card.  Finally, Conte also determined from reviewing the bank records that Marshall had misappropriated another $159,597.82 from those accounts for non-business-related expenses.

Marshall's receipt of funds from investors and his distributions of purported royalty payments to investors deceived investors into believing that Marshall and Adz would use the funds for legitimate business purposes when, in fact, Marshall misappropriated investor funds for his personal use and expenses.  He knew or was reckless in not knowing that he was committing, or he failed to exercise reasonable care regarding committing, a manipulative or deceptive act in furtherance of a scheme to defraud by misappropriating substantial amounts of investor funds for his personal benefit.

Adz's offering materials, which Marshall drafted, promised investors a full refund of their investment.  One document, entitled "Fractional Ownership Cancellation," which was available on Adz's website, represented that "[e]xisting fractional owners may request to cancel their fractional ownership agreement for any reason during [sic] first (12) twelve months of their contract and receive a refund of all amounts they have paid under their fractional ownership agreement."  The document further stated that the refunds would be paid in quarterly

1  installments and that the full refund amount would be paid within 12 months of each request.

2  Adz could not have refunded all of the investors' investments. It had insufficient funds available

3  to do so because of its failure to generate any meaningful revenue and because its funds were

4  depleted by the royalty payments it routinely made to investors and Marshall's misappropriation

5  of investor funds. Marshall knew, or was reckless in not knowing, that Adz would not be able to

6  provide full refunds to investors. Marshall also failed to exercise reasonable care by making

7  materially misleading representations and omissions regarding the ability of Adz to pay full

8  refunds to investors. The inability to receive a full refund of the investment was material to each

9  investor's decision to invest.

10      Adz's offering materials contained baseless financial projections. The projections were

11  purportedly based on Marshall's supposed belief that Adz could sell 60-second ads for 99¢ each,

12  but there was no reasonable basis for that belief. Marshall was aware of undisclosed facts

13  tending to undermine the accuracy of the financial projections contained in Adz's offering

14  materials. For example, Marshall knew or was reckless in not knowing that Adz had only

15  generated $5,000 in revenue from the sale of advertisements and did not have contracts to

16  generate the advertising revenue that it projected in its offering materials. He did not disclose

17  this fact to the investors. He also knew or was reckless in not knowing the technical issues

18  related to the poor visibility of the monitors on Adz's cars. Again, Marshall did not disclose this

19  fact to investors. Investors would have considered it material to their investment decision to

20  know that there was no reasonable basis for the financial projections contained in Adz's offering

21  materials.

22      Investors also would have considered it material to their investment decision to know of

23  the undisclosed facts tending to undermine the accuracy of the financial projections. Such

information included the facts that Adz had only generated $5,000 in revenue from the sale of advertisements; Adz did not have contracts to generate the advertising revenue that it projected in its offering materials; and Adz had technical issues related to the poor visibility of the monitors.  Marshall knew, or was reckless in not knowing, that these misrepresentations were false and misleading when made.  Marshall also failed to exercise reasonable care by making materially misleading representations and omissions regarding the projected revenues that each car would generate that were contained in Adz's offering materials.

Marshall received money by means of the noted materially untrue statements and omissions in the offer and sale of Adz's securities.  In addition to obtaining money in the form of large cash withdrawals, checks made payable to himself, and payments for personal expenses—all paid for by investor funds—Marshall also paid himself salary and bonuses of approximately $180,000 from funds raised from investors in Adz.

## Procedural Background

In October 2018, Marshall consented to the entry of judgment against him for the disgorgement of ill-gotten gains; prejudgment interest on those gains, calculated from January 1, 2014; and a civil penalty ("Consent Judgment").[5]  Marshall and the SEC agreed that the court would determine the amount of that judgment on the SEC's motion.[6]  Marshall also waived findings of fact and conclusions of law and waived any right to appeal from the resulting final judgment.[7]

---

[5] ECF Nos. 19 (stipulation); 21 (Judgment Upon Consent).

[6] *Id*. at 3.

[7] *Id*. at 2.

The SEC filed its disgorgement-and-prejudgment-interest motion in February 2019 and Marshall timely responded.[8]  He made several cursory arguments that the SEC failed to offer sufficient evidence to show that he withdrew or used investor funds for personal purposes, and he noted that the Consent Judgment permitted the parties to take discovery, including discovery from appropriate non-parties.  He contended that "it would be reasonable to allow a discovery period of 120 days to investigate Plaintiff's records and documents and if the parties cannot agree on a number that there would be a hearing before the Court to determine the final number for disgorgement."

In April, the parties stipulated that the SEC would produce "the financial records from which its disgorgement amount is calculated, along with an identification of the account entries underlying those calculations" to Marshall by May 13.[9]  Marshall would then produce any documentation he had supporting his "characterization of any of the items in those calculations as business expenses or reimbursements" by June 13.[10]  In July, the parties stipulated for Marshall to file a supplemental brief concerning the SEC's motion by October 14, and that the SEC could file a supplemental reply no later than November 12.  The parties further agreed to a hearing on the SEC's motion in December.  The magistrate judge ultimately set that hearing for December 4, 2019.

At the outset of that hearing, Marshall's current counsel advised the magistrate judge that Marshall had retained the him day prior and that, five minutes before the hearing, Marshall, his former counsel, and his current counsel signed a substitution of attorney.  The magistrate judge

---

[8] ECF No. 29.

[9] ECF No. 31.

[10] *Id.*

8

approved the substitution.  Marshall then requested that the hearing be continued for 30 days, and the magistrate judge denied that request.  Marshall filed an objection.[11]

### Analysis

**A.       Marshall's Objection to Magistrate Judge's Denial of Continuance [ECF No. 43]**

I have reviewed the recording of the hearing held before the magistrate judge.  At the outset of the hearing, counsel asserted that, "for [Marshall] to have a fair hearing, [counsel] need[ed] to do some discovery in this case, as to the leaking of information that has somehow gone from Mr. Marshall to a client of prior counsel to the government which somehow has caused him, we believe, severe harm and we cannot proceed today, your Honor."  In response to this oblique assertion, the magistrate judge said that she would require specific information to be able to consider the motion to continue.  In the ensuing discussion between counsel and the magistrate judge, however, counsel continued to generally argue his desire to investigate an asserted leak of information by former counsel or a client of the former counsel without offering any argument as to the relevance of this desire to continue the hearing on the SEC's motion.

The magistrate judge then turned to the government, which argued the merits of its motion to set the amount of disgorgement.  The government, too, was unable to discern the purpose of the requested continuance and noted Marshall's failure to file a supplemental brief.  The government contended that Marshall's counsel's arguments lacked any meaningful relevance to the SEC's motion.

The magistrate judge recessed the hearing to give Marshall's counsel an opportunity to talk with Marshall.  Immediately following the recess, counsel asked for a one-month continuance for additional discovery:

---

[11] ECF No. 43.

> Yes your Honor, let me maybe just simplify this. We have a strong belief, not just a shot in the wind, that information went from Mr. Marshall to [former counsel]. That information went to the government. And there's no way the government would know about it, I mean not just the SEC but also the U.S. Attorney's office in the criminal case. And there's no way that they would have this information but for Mr. Marshall giving it to [former counsel]. Call it collusion, call it what you want, but there's been a breach in that, and that breach has been detrimental to Mr. Marshall. And that's the breach I need to track down. I'd like more than a month but I understand the court has been very kind in the past giving an extension. And one month to let me track down this breach and get some testimony under oath because there's no way that the FBI would have gotten the information but for through [former counsel] or [former counsel's] person we believe is leaking. And so I just need one month to do some very limited discovery, your Honor. [Unintelligible] one deposition, maybe, maybe two at the most. It would probably be [former counsel], and probably be this person we believe Mr. Johnson's client who we know has been interviewed by the, a current client and a client for years who we know has been interviewed by the FBI in the case. And that's all I need to do, your Honor, to see because that could be catastrophic to Mr. Marshall. I just want one month to do it.

The magistrate judge broadly inferred from counsel's argument that his purpose in seeking the continuance was to obtain information to form a basis for setting aside the Consent Judgment. She denied the request because counsel failed to support his allegations with any evidence, the apparent time that had passed since this asserted breach might have occurred, and the age of this action.

In his objection to the magistrate judge's denial, Marshall claims that his counsel asked to continue the matter "so that he could familiarize himself with the case and file a supplemental brief, if allowed by the Court."[12] But my careful review of the recording of the hearing reveals that counsel made neither request during the hearing. Though he did note that he had just come

---

[12] ECF No. 43 at 2.

into the case and was not familiar with it, the reason he gave for the continuance request was the alleged leak of information, and he did not request an opportunity to file an untimely supplemental brief.  Rather, he asked to continue the hearing so that he could conduct depositions and investigate the alleged leak.  Counsel has offered no argument suggesting that the magistrate judge erred in denying his request to continue the hearing to allow him to engage in that investigation.  So I find that the magistrate judge appropriately denied Marshall's request to continue the hearing on the SEC's motion to determine the amount of money that Marshall must pay under the Consent Judgment.  I thus overrule Marshall's objection to the magistrate judge's decision not to continue the hearing and allow counsel to engage in that investigation.

To the extent that Marshall's objection is a request that I continue this matter so that he can file a supplemental brief, I deny that request, too.  Marshall argues that the SEC's motion is "based only on Defendant's business records and fails to include his personal financial records." The argument fails for several reasons.  First, Marshall offers no argument that his personal financial records are relevant to showing that the funds the SEC has identified as misappropriated were actually used for business purposes.  Second—and critically—Marshall agreed that he would "produce to Plaintiff any documentation [that] Defendant contends supports a characterization of any of the items in those calculations as business expenses or reimbursements entered into an agreement" by June 13, 2019.  Marshall has not argued that he ever produced the asserted personal financial records he now asserts would support his supplemental brief.

Marshall further argues that the "failure by the SEC to take into account Defendant's personal financial records will lead to a gross miscarriage of justice as it calculates inflated damages based on an incomplete and misleading assessment of Defendant's financial means."

1    The argument fails, however, because Marshall's financial means are neither relevant to

2    determining the amount of funds he misappropriated nor relevant to determining an appropriate

3    civil penalty for his conduct.  So I proceed to decide the SEC's motion on its merits.

4

5    **B.     The SEC's Motion to Determine Disgorgement, Prejudgment Interest, and Penalty Amounts [ECF No. 28]**

6        *1.     Disgorgement*

7        "Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter

8    others from violating securities laws by making violations unprofitable."[13]  In contrast to

9    damages, which are designed to compensate fraud victims, disgorgement forces a defendant to

10   surrender his unjust enrichment and thus serves to reduce the incentive to violate the law.[14]  To

11   establish an appropriate disgorgement amount, the SEC need only show a "reasonable

12   approximation" of profits or investor losses causally connected to the violation.[15]  Once the SEC

13   has made such a showing, "the burden shifts to the defendant to 'demonstrate that the

14   disgorgement figure was not a reasonable approximation.'"[16]  As the Ninth Circuit has observed,

15   "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that

16   uncertainty."[17]

17

18

19

20   [13] *SEC v. First Pac.* Bancorp, 142 F.3d 1186, 1191 (9th Cir. 1998) (quotation marks and citations omitted).

21   [14] *SEC v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993) (disgorgement is an appropriate equitable remedy for violations of the securities laws).

22   [15] *SEC v. Platforms Wireless*, 617 F.3d 1072, 1096 (9th Cir. 2010).

23   [16] *Id.* (quoting *SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989)).

     [17] *Id.* (quoting *First City Financial*, 890 F.2d at 1231, 1232).

The facts alleged in the SEC's complaint establishing Marshall's liability and violations of the federal securities law are undisputed and admitted for purposes of the SEC's motion.[18]  I must accept those allegations as true in considering the SEC's motion.  The Ninth Circuit has held that a consent and judgment of injunctive relief precludes a defendant from denying or arguing that he did not violate the federal securities laws in the manner set forth in the SEC's complaint.[19]

In addition to the uncontestable allegations of the complaint, the SEC's motion presents a reasonable, evidence-based approximation of the amounts of Marshall's ill-gotten gains.  Conte's declaration summarizes his review of bank, brokerage, and other financial records for Adz and Marshall, including accounts on which Marshall was a signatory.  Conte cites:  (1) the accounts at issue; (2) the fact that Adz investor funds flowed into the accounts; and (3) the amounts of investor funds converted by Marshall in the forms of ATM and cash withdrawals, brokerage account transfers, and various other non-business related expenses.[20]

By stipulation, Marshall received the  financial records from which Conte calculated the disgorgement amount, along with an identification of the account entries underlying those calculations.  In his cursory opposition to the SEC's motion, Marshall asserts "that many of the transactions characterized by [him] as personal expenditures[] were actually legitimate business expenses that should not be considered in the disgorgement amount to be determined by the court."[21]  But in his stipulation with the SEC to exchange discovery, Marshall agreed to disclose

---

[18] ECF No. 19.

[19] *S.E.C. v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1112 (9th Cir. 2006) (affirming grant by district court of disgorgement, prejudgment interest and civil penalties where defendant had previously consented to entry of permanent injunction).

[20] ECF No. 28-1.

[21] ECF No. 29 at 2.

any documentation to support that assertion by June 13, 2019, and he did not make such a disclosure—timely or otherwise.  Rather, Marshall's counsel sent the SEC an email to which he attached information that Marshall claimed should be considered an offset and which Marshall characterized as representing a repayment of money he lent to the business.  In a response to this email, the SEC characterized the materials that Marshall produced as reflecting $279,850 in "investment amounts," $251,762.50 in "settlement amounts" corresponding to settlement agreements with some investors, and $28,087.50 in "distributions" to certain investors.  The SEC noted the lack of independent evidence of the distribution of $28,087.50 to the investors.  The SEC further noted that Marshall was required to produce evidence that he had actually paid money back to investors, rather than evidence merely of an agreement to repay.

The SEC has also shown that it served discovery requests on Marshall relevant to its present motion after the June 13, 2019, discovery production date, giving Marshall an additional chance to disclose any documents or evidence relevant to determining whether the SEC's disgorgement figure was not a reasonable approximation.[22]  Marshall invoked his Fifth Amendment right against self-incrimination and declined to produce documents supporting his assertions.[23]

Similarly, Marshall has offered no evidence to support the assertions in his briefing about the amount of disgorgement.  Since Marshall has not offered any evidence or compelling argument challenging the appropriateness of the SEC's disgorgement calculations, and because the government's estimation of the amount of disgorgement appears reasonable, I find that

---

[22] ECF No. 40-2.

[23] *Id.*

1  Marshall must disgorge $1,473,661, plus prejudgment interest in the amount of $286,103,[24]

2  representing profits gained as a result of the conduct alleged in the complaint.

3          **2.     *Civil Penalty***

4          The judgment to which Marshall consented also binds him to pay a civil penalty in an

5  amount that I must determine.  Congress enacted the civil penalty provisions to achieve the dual

6  goals of punishment of the individual violator and deterrence of future violations.[25]  Deterring

7  securities fraud with monetary sanctions serves important goals including encouraging investor

8  confidence, increasing the efficiency of financial markets, and promoting the stability of the

9  securities industry.[26]  Section 20(d)(1) of the Securities Act, 15 U.S.C. § 77t(d)(1), and Section

10 21(d)(3)(A) of the Exchange Act, 15 U.S.C. § 78u(d)(3)(A), provide three tiers of maximum

11 penalty amounts for specified degrees of culpability.  The most serious violations are punishable

12 by third-tier penalties.  For conduct occurring after February 14, 2005, the third tier imposes a

13 maximum limit for each violation of the greater of (1) $160,000 for a natural person or $775,000

14 for any other person, or (2) the gross amount of pecuniary gain to the defendant as a result of the

15 violation.[27]  A third-tier civil penalty is appropriate if the violation involves fraud, deceit,

16 manipulation, or deliberate or reckless disregard of a regulatory requirement and if it directly or

17 indirectly resulted in substantial losses or created a significant risk of substantial losses to

18

19 [24] The Consent Judgment states that "Prejudgment interest shall be calculated from January 1,
20 2014, based on the rate of interest used by the Internal Revenue Service for the underpayment of
   federal income tax as set forth in 26 U.S.C. § 6621(a)(2)."  ECF No. 19 at ¶ 4.  Conte performed
21 the calculation and set it forth in his declaration.  *See* ECF No. 28-1 at ¶¶ 20–21.  I find it
   accurate.

22 [25] *SEC v. Marker*, 427 F. Supp. 2d 583, 592 (M.D.N.C. 2006) (citing *SEC v. Coates*, 137 F.
   Supp. 2d 413, 428 (S.D.N.Y. 2001)).

23 [26] *SEC v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998).

   [27] 17 C.F.R. §§ 201.1001, 201.1005.

others.[28] Courts routinely consider five factors, established by the Ninth Circuit in *S.E.C. v. Murphy*,[29] when calculating civil penalties: (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of the defendant's professional occupation, that future violations might occur; and (5) the sincerity of the defendant's assurances against future violations.[30]

Marshall's violations of the antifraud and securities registration provisions of the securities laws, as alleged in the complaint and that I must deem as true for purposes of this motion, clearly meet the statutory criteria for a third-tier penalty.  Marshall raised more than $5.7 million on misrepresentations to investors, including baseless financial projections and lies about the availability of refunds, and by engaging in a scheme to defraud, which involved operating Adz as a Ponzi scheme and misappropriating substantial amounts of investor funds.  His violations involved fraud and deceit, as well as a knowing and repeated use of investors' money in direct conflict with representations made to investors, and his deceptive and intentional acts caused substantial losses to investors.  Marshall acted with a high level of scienter.  Because I find that third-tier civil penalties are appropriate, I order Marshall to pay a civil penalty of $1,473,661, which is equal to the amount of Marshall's gross pecuniary gain.

## Conclusion

Accordingly, with good cause appearing and no reason to delay, IT IS HEREBY ORDERED that the defendant's Objection to Magistrate Order **[ECF No. 43] is OVERRULED.**

---

[28] 15 U.S.C. §§ 77t(d)(1), 78u(d)(3)(A).

[29] *S.E.C. v. Murphy*, 626 F.2d 633 (9th Cir.1980),

[30] *See, e.g.*, *S.E.C. v. Alpha Telcom, Inc*, 187 F. Supp. 2d 1250, 1263 (D. Or. 2002) (applying the factors to assess a civil penalty).

IT IS FURTHER ORDERED, ADJUDGED AND DECREED the plaintiff's Motion for Final Judgment Setting Amounts of Disgorgement, Prejudgment Interest, and Civil Penalty Against Defendant Robert Cortez Marshall **[ECF No. 28] is GRANTED.**  Marshall must pay the following sums: $1,473,661 in disgorgement, prejudgment interest thereon of $286,103, and a civil penalty in the amount of $1,473,661; for a total sum of $3,233,425.

With good cause appearing and no reason to delay, IT IS FURTHER ORDERED, ADJUDGED, AND DECREED THAT the **Clerk of Court** is directed to ENTER FINAL JUDGMENT as set forth below and **CLOSE THIS CASE:**

1. Defendant Robert Cortez Marshall, along with (i) his officers, agents, servants, employees, attorneys, and (ii) other persons in active concert or participation with him or anyone described in (i), who receive actual notice of this judgment by personal service or otherwise, are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

   (a) to employ any device, scheme, or artifice to defraud;

   (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

   (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

2.      Defendant Robert Cortez Marshall, along with (i) his officers, agents, servants, employees, attorneys, and (ii) other persons in active concert or participation with him or anyone described in (i), who receive actual notice of this judgment by personal service or otherwise, are permanently restrained and enjoined from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a) to employ any device, scheme, or artifice to defraud;

(b) to obtain money or property by means of any untrue statement of a  material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which  they were made, not misleading; or

(c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

3.      Defendant Robert Cortez Marshall is permanently restrained and enjoined from violating Section 5 of the Securities Act, 15 U.S.C. § 77e, by, directly or indirectly, in the absence of any applicable exemption:

(a) Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b) Unless a registration statement is in effect as to a security, carrying or  causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c) Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the SEC as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act, 15 U.S.C. § 77h.

4. Defendant Robert Cortez Marshall **must DISGORGE the sum of $1,473,661**, representing profits gained as a result of the conduct alleged in the complaint; **he must pay prejudgment interest thereon in the amount of $286,103, plus a civil penalty in the amount of $1,473,661**, under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3). Defendant Robert Cortez Marshall must satisfy this obligation by paying **the total sum of $3,233,425** to the SEC **within 14 days of the entry of this judgment**.

(a) Defendant may transmit payment electronically to the SEC, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/ offices/ofm.htm. Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

(b) Payment must be accompanied by a letter identifying the case title, civil action

19

number, and name of this court; and identifying Robert Cortez Marshall as a defendant in this action and specifying that payment is made as to this judgment.

(c)     Defendant must simultaneously transmit photocopies of evidence of payment and case identifying information to the SEC's counsel in this action.

(d)     By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds, and no part of the funds will be returned to him.  The SEC must send the funds paid against this judgment to the United States Treasury.

(e)     The SEC may enforce the judgment for disgorgement and prejudgment interest by moving for civil contempt (and/or through other collection procedures authorized by law) at any time after the 14th day following entry of this judgment.

(f)     Defendant must pay post-judgment interest on any delinquent amounts under 28 U.S.C. § 1961.

5.     The Consent of Defendant Robert Cortez Marshall to Entry of Judgment [ECF Nos. 19, 21] is incorporated herein with the same force and effect as if fully set forth herein, and Marshall must comply with all of the undertakings and agreements set forth therein.

6.     For purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the allegations in the complaint are true and admitted by Defendant Robert Cortez Marshall, and any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant Robert Cortez Marshall under this judgment or any other judgment, order, consent order, decree, or settlement agreement entered in connection with this proceeding is a debt for the violation by Defendant Robert Cortez Marshall of the federal securities laws or

any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

7.     This Court will retain jurisdiction over this matter for the purposes of enforcing the terms of this judgment.

      Dated: June 8, 2020

_____
U.S. District Judge Jennifer A. Dorsey